UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALAN ETT,<br><br>    Plaintiff,<br><br> v.<br><br>SPIRIT MUSIC GROUP, INC., SPIRIT MUSIC COLLECTIVE, LLC, SPIRIT CATALOGUE HOLDINGS SARL, SPIRIT MUSIC COLLECTIVE SARL, LYRIC CAPITAL MANAGEMENT GROUP, LP, JONATHAN SINGER, and ROSS CAMERON,<br><br>    Defendants. | Case No.: 1:24-cv-676<br><br><br>**FIRST AMENDED COMPLAINT**<br><br>**Jury Trial Demanded** |

   Plaintiff Alan Ett ("Ett"), by his attorneys Cowan, DeBaets, Abrahams & Sheppard LLP, alleges the following in support of his claims and causes of action against Spirit Music Group, Inc. ("SMG"), Spirit Music Collective, LLC ("SMC"), Spirit Catalogue Holdings, SARL ("SCH"), Spirit Music Collective SARL ("Spirit LuxCo"), Lyric Capital Management Group, LP ("Lyric"), Jonathan Singer, individually ("Singer"), and Ross Cameron, individually ("Cameron"); SMG, SMC, SCH, Spirit LuxCo, Lyric, Singer, and Cameron are collectively referred to herein as "Defendants."

<u>**NATURE OF THE ACTION**</u>

   1. This case concerns a prolific composer and music executive who was systematically lied to and taken advantage of by putative business partners who sought to leverage the fruits of his musical compositions to increase the value of their companies, while cutting him out of the proceeds and mismanaging the intellectual property they agreed to diligently administer. In connection with his employment by SMC and his sale of various companies, Defendants and Ett

1

agreed to split certain revenue streams flowing from specific parts of his massive catalogue, and Ett agreed to extend his employment (and associated revenue streams) based on misrepresentations by Singer concerning financial incentives Ett would receive if he continued as SMC's CEO. Ett relied on those false statements and trusted Defendants to deliver what they promised. But his trust was betrayed. Defendants unceremoniously terminated him right before a significant capital raise that Ett expected to share in, and worse, thereafter continued to wrongfully claim ownership over musical compositions to which they never had a legal ownership right and collect royalties they were not entitled to under the applicable contracts. This lawsuit seeks to restore Ett's lawful ownership rights in thousands of his musical compositions, vindicate infringements of his works, and compensate him for Defendants' various forms of malfeasance.

2. Specifically, Defendants owe Ett significant damages in light of their copyright infringement and by way of improper claims to and exploitation of musical compositions and collection of revenue streams that they do not own. Ett also seeks a declaratory judgment concerning his proper ownership of various copyrighted works that Defendants wrongfully claim as their own.

3. Defendants also owe Ett significant monetary damages as a result of their other unlawful actions, including breaches of contract, fraud, and unjust enrichment.

## THE PARTIES

4. Ett is an individual residing and domiciled in British Columbia, Canada. Ett was previously domiciled in Los Angeles, California.

5. Ett is a lifelong musician, prolific songwriter, composer, and producer. He has composed and produced music for television, video, film, and commercials. Ett has also

collaborated on the production of various technological advancements in the music industry, including MIDI software, was on the faculty of Berklee College of Music, and serves on the boards of many foundations.

6.  Ett has been a successful entrepreneur and executive, starting his own music companies and other ventures beginning in 1991. He sold several of his music-related businesses pursuant to a January 1, 2017, Asset Purchase Agreement ("APA") entered into with several of the defendants.

7.  SMG is a Delaware corporation with its principal place of business in New York, New York. SMG is the parent company of SMC. SMG is a music publishing company that provides music services including composition, music supervision, editing, and mastering, as well as clearance, administration, and licensing.

8.  SMC is a Delaware limited liability company with its principal place of business in Los Angeles, California. SMC was a music publishing company that provided music services including composition, music supervision, editing, and mastering, as well as clearance and licensing.

9.  Upon information and belief, SMC is no longer a fully functioning company providing the aforementioned services. Upon information and belief, SMC eliminated all its employees in 2022 and its sole function at the present time is collecting residual income derived from the previous exploitation of musical works by SMC (including Ett's works) and the current exploitation by third parties. It is unclear whether or to what extent SMC still owns any rights in and to Ett's works, and Ett recently learned that SMC's website is no longer active.

10.  SCH is a Luxembourg limited liability company that was a signatory to the APA that is jointly and severally liable for obligations under Article 2 of the APA pursuant to § 12.1 thereof.

11.   Spirit LuxCo is also a Luxembourg limited liability company that was a signatory to the APA that is jointly and severally liable for obligations under Article 2 of the APA pursuant to § 12.1 thereof.

12.   Upon information and belief, Lyric is a New York limited partnership headquartered in New York. It is a private equity firm focused on investing in music royalties and is the parent company of SMG. Upon information and belief, in early-to-mid 2019, Singer and Cameron formed Lyric and used it as a vehicle to purchase some or all of the copyright assets of SMC and SMG when they took over the companies from their prior leadership and investors.

13.   Jonathan Singer is an individual domiciled in Connecticut with offices in New York City and is the Chairman of SMC, SMG, and Lyric.

14.  Ross Cameron is an individual domiciled in Charleston, South Carolina, with offices in New York City and is an executive of SMC, SMG, and Lyric, and a partner of Singer's.

## **JURISDICTION**

15.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338 because this case involves federal claims arising under the Copyright Act, 17 U.S.C. § 101, et seq.

16.  This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(a)(2) because there is complete diversity and more than $75,000 is in controversy.

17.  This Court has supplemental jurisdiction over Ett's state law claims pursuant to 28 U.S.C. § 1367 because those state law claims are so related to the claims in the action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

18. This Court has personal jurisdiction over SMG because it has its principal place of business in New York.

19. This Court has personal jurisdiction over SMC, SCH, and Spirit LuxCo pursuant to § 11.9 of the APA, which provides that the APA is governed by New York law and that the parties thereto agreed that any action brought thereunder shall be brough in the federal or state courts located in New York County, New York. The parties irrevocably waived objections on the grounds of venue, forum non-conveniens, or any similar grounds and consented to service of process in any manner permitted by applicable law and consented to the jurisdiction of such courts.

20. This Court has personal jurisdiction over Lyric because, on information and belief, it is a New York partnership with its principal place of business in New York.

21. This Court has personal jurisdiction over Singer because Singer has offices in, and does substantial business in New York, and the claims herein arise out of such business, and because Singer committed a tort in his individual capacity (namely fraudulent inducement) in New York.

22. This Court has personal jurisdiction over Cameron because Cameron has offices in, and does substantial business in New York, and the claims herein arise out of such business, and because Cameron aided and abetted the commission of Singer's tort in New York.

## FACTUAL BACKGROUND

### The Employment Agreement

23. Ett, for many years, owned and operated various music companies (including publishers). He sold some of those companies to several of the defendants on January 1, 2017, pursuant to the APA.

24. Simultaneous with the APA, Ett became employed by SMC as its CEO pursuant to an Employment Agreement also dated January 1, 2017 (the "Employment Agreement") as amended in by Amendment No. 1 to the Employment Agreement dated October 28, 2019 (the "Amendment"), from that date through his unlawful termination by SMC on July 27, 2021.

25. Pursuant to § 2(a) of the Employment Agreement, Ett served as SMC's Chief Executive Officer, reporting directly to Jonathan Singer, the CEO SMG, and SMG's Chief Financial Officer/Chief Operating Officer, Joseph Borrino.

26. Ett's duties included "managing the day-to-day operations" of SMC, including oversight of employees, sales, and operations, pursuant to paragraph 2(a) of the Employment Agreement.

27. Pursuant to paragraph 2(b) of the Employment Agreement, Ett was contractually obligated to "devote [his] first-priority part-time attention and best efforts to the business affairs of the Company" and to "not actively engage in outside business activities" with a handful of exceptions. Ett consistently complied with this, foregoing other lucrative opportunities in the music publishing space to focus on his role as CEO of SMC pursuant to his contractual obligations.

28. During the course of his employment, Ett was frustrated by the management of SMC because SMG (via Singer, Cameron, and Borrino) controlled everything, including the company's purse strings, and did not allow him the freedoms expected of a CEO, including with respect to hiring, staffing, and administrative and logistical support.

29. Specifically, when Ett told Borrino that SMC needed to hire more staff (including to adequately staff the company to maintain client relationships) his suggestion was rejected. Indeed, Borrino refused to increase headcount even though SMC had terminated an upper-level employee a few years prior who had never been replaced.

30.  Ett reminded Borrino that, per the Employment Agreement Exhibit A (subsection 5) he did not need approval to hire new employees to fill these administrative roles, but Borrino warned him that doing so would "cause real problems" and prohibited Ett from making these hires despite his contractual authority, stymying Ett's ability to exercise his executive functions and effectively carry out the business of SMC.

SMC Corporate Transactions

31.  At the time Ett was hired by SMC and sold his companies to the Contract Defendants (defined below), SMG owned a portfolio of music publishing companies. The SMG group of companies was, in turn, owned by private equity firms Pegasus and Fortress.

32.  As noted above, in early-to-mid 2019, Singer and Cameron formed their own private equity company, Lyric, and used it to take over the SMG group of companies from their prior leadership (including David Renzer) and buy the companies from Pegasus and Fortress. The fund that Singer and Cameron used to purchase the SMG group of companies from Pegasus and Fortress will, for convenience, be referred to as "Fund 1."

33.  Eventually, as discussed further below, the management of SMG and Lyric (including Singer, Cameron, and Borrino) procured a large investment via a deal with Northleaf Capital Partners and Caisse de dépôt et placement du Québec (collectively, "Northleaf") just months after terminating Ett as SMC's CEO.  The fund used for the Northleaf investment in the SMG group of companies will, for convenience, be referred to as "Fund 2." As discussed below, there is a lack of clarity over whether Fund 1 and Fund 2 are one in the same or separate.

The Amendment

34.  On October 28, 2019, over two years after Ett entered into the Employment Agreement with SMC, Ett and SMC (via SMG, as signatory) agreed to the Amendment. The

Amendment modified the Employment Agreement by extending the term of Ett's employment until December 31, 2021; slightly increasing Ett's base salary as of January 1, 2021 (to a salary that was still well below-market for a CEO of Ett's caliber); and adding a subsection to § 5 of the Employment Agreement ("Other Benefits") which stated as follows: "(c) Incentive Plan. Upon the Company's [SMC] hiring of a new Operations/General Manager, the Parties agree to negotiate in good faith regarding the establishment of an Incentive Plan applicable to Executive [Ett]."

35. The discussions leading up to the signing of the Amendment on October 28, 2019 were extensive, and included in-person meetings, phone calls, and email exchanges.

36. Ett and Singer had an in-person meeting on April 9, 2019, at the Andaz Hotel coffee shop in the Andaz West Hollywood hotel. During that meeting, Ett requested that in addition to a salary increase, a material part of his ongoing employment be for Ett to share in both existing and future capital funds that would bring value to the SMG group of companies, including SMC (and the highly valuable assets Ett contributed to SMC by way of the APA).

37. Singer told Ett that while he could not offer Ett a substantial raise, Ett would have a "greater role" in the operations and future of the overall company structure (including a position and title with SMG and/or Lyric) and that Ett would receive the benefits of an "exciting incentive plan" and a series of "lucrative benefits" (collectively, the "Plan") if he signed the Amendment. This Plan was never even negotiated in good faith, let alone implemented.

38. At this meeting, Singer also emphasized that Ett was important to SMG and that Singer wanted Ett to have a bigger role in driving the direction of SMG. Singer stated that he was poised to propose this supposed "overall plan" for Ett's incentives and compensation to begin in January 2020.

39. When a private equity-backed company receives an investment, it is industry standard for company executives such as Ett to receive incentive-based compensation ("Incentive Allocations") from such capital funds; this can be a "carried interest" in such capital funds (e.g., a percentage of an investment that executives of an investment manager typically receive as compensation), or another form of incentive-based compensation based on an allocation of the fund manager's profits tied to fund performance upon a realization event. Indeed, Ett discussed these types of Incentive Allocations with Singer at the April 9, 2019 meeting and beyond, during in-person meetings, phone calls, and emails. That this topic came up during the April 9, 2019, meeting is corroborated by numerous emails between Ett and Singer wherein Ett follows up regarding Incentive Allocations.

40. Affording Ett this requested Incentive Allocation in the existing and future capital funds was what Ett expected based on Singer's statements during that April 9, 2019 meeting (and later) concerning his anticipated "greater role" in SMG, the "exciting incentive plan," the series of "lucrative benefits," and greater participation in the profitability of the companies. Further, Ett agreed to a below-market salary for a CEO—a salary which, given the combined royalties Ett was sharing and that Defendants were improperly keeping, was actually leaving Ett with net negative compensation—and no executive in his right mind would have done so without the potential for significant back-end compensation such as an Incentive Allocation. While Singer and Borrino later took the position that a $72,000 bonus they paid Ett for the year 2020 constituted the Plan itself, that is nonsensical in light of the foregoing.

41. Singer later backed away from the position that Ett could participate in the existing capital fund, i.e., "Fund 1" because it was allegedly closed, prompting Ett to challenge Singer, noting the relevant industry standards and the value brought to the company by Ett and other executives like Borrino. Indeed, Ett asked whether Borrino would receive a carried

interest in the existing Fund 1, Singer's response was that he would because Borrino was his "boy" and that Singer would "take care" of him, but not Ett.

42. However, Singer did reiterate that he (and SMG/Lyric) would consider Ett's participation in future capital funds, as was previously discussed at the April 9, 2019 meeting. It is important to note that while Singer's position was that the existing Fund 1 was "closed" and that Ett was therefore not entitled to share in it, Ett continued to inquire about being included in Fund 1 (particularly if other executives had received an interest therein) and never conceded that it would be impossible or otherwise inappropriate. Moreover, it was a misnomer to say that "Fund 1" was "closed"; money could have easily been allocated to Ett so he could participate, as Ett believes was done for Borrino.

43. Defendants have recently taken the position that Ett had no plausible interest in what became the Northleaf transaction because Singer told Ett he could not participate in Fund 1 due to it being "closed," and that the Northleaf transaction ultimately only involved Fund 1. But, as noted above, not only did Ett never agree that he was not entitled to a share of Fund 1 despite Singer taking that position, neither Singer nor anyone else at SMC, SMG, Lyric, or any other affiliated company ever characterized the Northleaf deal as having anything to do with Fund 1, and instead represented Northleaf as a separate transaction. As such, this new characterization of the transaction is implausible and does not undermine Ett's claims. Indeed, Ett was always under the impression that the Northleaf deal was being conducted via a separate fund, i.e., Fund 2, which Singer had previously indicated could be shared as part of Ett's "lucrative" incentive Plan including an Incentive Allocation.

44. Ett cannot verify the veracity of Defendants' recent characterization of the Northleaf transaction because he has never seen any Northleaf transaction documents, despite his requests to review them while he was still CEO of SMC. But as a practical

matter, this characterization does not matter because, as noted above, Ett could have easily been included in Fund 1 retroactively, and thus the notion of it being "closed" is nonsensical.

45. Regardless of characterization and whether Fund 1 and Fund 2 are technically the same or different, the import and impact of Singer's misrepresentations are consistent. Ett's expectations based on his discussions with Singer and Singer's representations at the April 9, 2019 meeting and beyond were that he would receive the Plan, inclusive of an interest (i.e., an Incentive Allocation) at least in future investments in the SMG group of companies alongside a larger role in the overall company hierarchy. As noted above, Defendants later claimed that a $72,000 bonus they paid Ett for the year 2020 constituted the Plan and that Defendants had satisfied their contractual obligations and not misrepresented anything to Ett. This is, of course, not true.

46. Notwithstanding whether there was one or more fund, the time of the Northleaf investment would have been the appropriate point to set a new valuation of the companies (which Defendants presumably did anyway during the process of seeking the investment) and establish Ett's expected financial incentives deriving from that investment even if it were not a direct percentage of the relevant fund itself.

47. Indeed, it is common practice in private equity for Incentive Allocations to take forms other than direct percentages; for instance, the interest could be tied to performance-based thresholds and realization events. The misrepresentations and results are the same: ultimately Singer made material misrepresentations regarding giving Ett lucrative financial benefits tied to his continued employment with SMC, which Ett relied on in agreeing to the Amendment.

48. The financial incentives relating to the expected interest in at least future investments in the SMG group of companies were a critical benefit to the bargain to Ett. While

the Amendment stated that the Employment Agreement's terms would continue to govern the Parties' relationship, the financial incentives arising during the first three years of Ett's employment had already been realized to the tune of more than $1.6 million (plus a percentage of the companies' free cash flows). Ett was therefore keen on agreeing to a new set of incentives because the ones contemplated by the Employment Agreement and APA were no longer relevant. A central reason Ett agreed to extend his employment with SMC was the prospect of earning as much, if not more than he had during his first term as CEO.

49. The Plan, including an Incentive Allocation, was also particularly important to Ett because, along with his execution of the Employment Agreement, Ett had signed the APA, pursuant to which he had transferred rights in many of his earlier compositions, entitling SMC to a lucrative share in Ett's royalty streams during the time of Ett's employment that vastly exceeded the compensation Ett was receiving pursuant to his employment by SMC.

50. When it was revealed in 2020 that Singer and Cameron were working to recapitalize Lyric and SMG, Ett asked to see the investment book because he believed he could help raise money through his broad relationships in the investment community interested in the music sector. The capital raise was relevant to Ett not only because SMC as an affiliated entity would influence the promised benefits flowing from the Plan (including Incentive Allocations), but because a critical component to his discussions with Singer (including during the April 9, 2019 meeting) was that Ett was supposed to receive a more prominent role in the overall SMG group of companies, including either SMG itself or Lyric.

51. Singer and Cameron said they would provide Ett with the book when it was done, but this document was never provided to their own subsidiary's CEO even though there was an active money raise being pursued. Upon information and belief, as discussed further below, Singer and Cameron did this to prevent Ett from seeing in print how he and his

previously sold companies were being portrayed in the book, currently and strategically.

52. Music publishing companies are valued as a multiple of Net Publishers Share (the revenue retained after all interested parties are paid). Upon information and belief, in their own Net Publishers Share analysis Singer and Cameron had included the royalty streams from Ett's properties and the IP acquired via the APA and thus enjoyed the positive effect that the Ett-generated royalty streams had on their valuation from his personal composer royalties as well as from publishing royalties to the Ett companies and works they did not own at all. But, utilizing their total control of SMC, Singer, Cameron, and Borrino refused to front the overhead to properly manage Ett's properties or include Ett in any discussions (let alone allow Ett to make any of these day-to-day decisions).

53. In October 2021—two months after Ett's unlawful termination—Lyric successfully procured what was reported in the media to be a $500,000,000 capital infusion via its deal with Northleaf. Upon information and belief, Lyric misrepresented its (and SMC's and SMG's) relationship with Ett in transactions with these investors to reap the most financial benefit and did not disclose any of its administrative and staffing failures.

54. Specifically, Ett believes the companies either misrepresented to investors that they had properly acquired Ett's publishing income and therefore mischaracterized revenues, or misleadingly stated that they were entitled to an inflated amount of composer royalties regardless of Ett's employment status, thereby also misrepresenting revenues. And, as noted above, they certainly did not disclose that SMC and SMG systematically refused to pay for necessary administrative support and overhead to make their IP profitable.

55. Upon information and belief, Defendants were using Ett and his musical assets to extract higher valuations of their financial interests (by showing investors a façade of stability with an experienced CEO and by misrepresenting royalty streams) while willfully

failing to comply with their contractual obligations to Ett.

56. Indeed, upon information and belief, one of SMC's justifications for unlawfully terminating Ett was so that SMC could cut Ett out of any share in the Northleaf investment that was procured using Ett's valuable presence and contributions and IP as leverage.

The APA

57. Along with his execution of the Employment Agreement, Ett had signed the APA, pursuant to which (under ¶ 2.1) he had transferred copyrights in many of his earlier compositions (the "Historic Compositions"), entitling SMC to a lucrative contractual interest in Ett's royalty streams: 75% of his writer's share of public performance income in the Historic Compositions and 50% of participation in his writer's share of public performance income in works that were created or co-created by Ett, or for which Ett received writing or co-writing credit, after January 1, 2017, during the term of his employment (the "Post-2017 Compositions").

58. Nothing in the APA entitled Defendants to a contractual share in any royalties or music publishing income other than the time-limited percentages of Ett's writer's share of public performance income referenced above. None of the Defendants ever entered into any separate publishing deal with Ett. The mere fact that SMC engages in music publishing does not automatically grant it all publishing income in and to the Post-2017 Compositions. As a matter of basic copyright law, as a co-author of the Post-2017 Compositions, Ett is by default the co-owner of all publishing income unless an agreement states otherwise, and as noted above, there was never a publishing agreement between Ett and SMC or any of the other Defendants that would dictate these terms.

59. Pursuant to ¶ 6.6 of the APA, SMC was responsible for administering payments flowing from exploitation of the compositions covered by the APA.

60. Pursuant to ¶ 2.2(a) of the APA, SMC was obligated to "assume and . . . pay and perform, satisfy and otherwise discharge all obligations and liabilities" accruing with respect to "Assets," including, *inter alia*, the "Ett Future Writer Share" and to handle administrative tasks relating to royalty payments for such "Assets," which would include the "Ett Future Writer Share," pursuant to Section 6.6.

61. In light of SMC's extensive mismanagement and intentional lack of appropriate staffing, it was consistently unable to handle these administrative responsibilities set forth by the APA. Indeed, upon information and belief, SMC outsourced administration to a third-party administrator run by one of SMC's former employees instead of hiring more staff to perform those administrative functions. This at very least constitutes a tacit acknowledgment of SMC's administrative failures (and a further reduction of Ett's earnings given that an administration fee would have to be paid).

Ett's Termination

62. Ett was terminated as CEO on July 27, 2021, without cause, and without the notice required by the Employment Agreement.

63. Ett's termination was carried out on the heels of his raising concerns to executives like Singer, Cameron, and Borrino surrounding their mismanagement of the administrative functions of the companies they had acquired from Ett and the Defendants' lack of adequate staff to maintain client relationships.

64. SMC and SMG had failed and continue to fail to effectively administer Ett's pre- and Post-2017 Compositions. For instance, SMC failed to register thousands of Ett's Post-2017 Compositions with the applicable performing rights organization, BMI (in violation of ¶ 2.2(a) and ¶ 6.6 of the APA), depriving Ett of significant revenue. Lyric, whom Ett believes to now be the purported owner of these works, continues this mismanagement.

15

65. SMC's delinquency was caused, in large part, because it was demonstrably understaffed, tasking only one employee with handling all registrations with BMI, leading that person to fall behind in registering the works by the thousands, and depriving Ett of contractually owed royalty payments—a fundamental task expected of a competent music publisher and administrator. These failures even seemed predetermined; for instance, the definition of EBITDA in the APA reserves the right for the Contract Defendants to include costs for royalty administration, legal, and operations to the extent they fail to provide such services to a degree reasonably sufficient for the operation of Ett's companies.

66. As noted above, when Ett told Borrino that SMC needed to hire more staff his suggestion was rejected, and Borrino had refused to increase headcount even though SMC had terminated an upper-level employee a few years prior who had never been replaced.

67. Shortly thereafter, the sole employee handling performing rights organization registrations quit, exposing Ett to the loss of crucial compensation owed for thousands of Post-2017 Compositions (both through BMI and societies abroad), all because SMC refused to staff this necessary position. SMC effectively defeated the purpose of its own business as a music publisher and administrator, undermining its own core business and the purpose of bringing Ett on as CEO to oversee employees, sales, and operations, and as a co-writer for many compositions during the term of his employment.

68. To be clear, there was no expectation that Ett would be administering the Compositions individually.

69. Moreover, as noted above, SMC has largely been stripped of its employees and now engages in materially limited functions compared to before. To make matters worse, it recently came to Ett's attention that SMC removed upwards of 30,000 of Ett's copyrighted works out of its catalogues for no apparent reason. Upon information and belief, this number includes at

least some of the Post-2017 Compositions. SMC had a contractual duty to administer, represent, distribute, and exploit all of Ett's compositions, thereby causing Ett untold financial harm in the form of lost public performance revenues SMC has a duty to administer and collect.

<u>Defendants' Improper Claim to Ett's Writer's Share of Public Performance Royalties</u>

70. Defendants have been improperly continuing to claim and collect half of Ett's 50% writer's share of public performance royalties for the Post-2017 Compositions since Ett's termination, while the APA only permitted SMC to do so while Ett was employed.

71. Specifically, per ¶ 2.1(a)(iii) of the APA, SMC acquired "[a] 50% undivided interest in and to the Writer's Performance Income Share paid or credited to Ett in respect of any and all musical compositions created after the Effective Time [of the APA] for which Ett is paid or credited as a writer or co-writer *during the term of his employment with [SMC]*." (Emphasis added).

72. The Employment Agreement, paragraph 7(e), in turn, specifically states that "all discoveries, inventions, ideas, technology, formulas, designs, software, programs, algorithms, products, systems, applications, processes, procedures, methods and improvements and enhancements" Ett created during his employment period are owned by SMC "[e]xcept with respect to the results and proceeds of [Ett's] services as a songwriter." (Emphasis added). While apparently inconsistent with the above-cited provision of the APA, the overall effect of the two contracts is that SMC only had limited contractual rights to music written by Ett while Ett was employed by SMC.

73. Pursuant to these provisions, Ett signed a notice to performing rights organizations such as BMI instructing them to pay one-half of his writer's share of public performance royalties for the Post-2017 Compositions to SMC. This assignment was intended to last only

during the course of Ett's employment with SMC (and likely would have amounted to approximately more than $350,000 by 2021—more than Ett's own annual salary under the Employment Agreement).

74. Nothing in the Employment Agreement or APA would entitle Defendants to a continuing share in Ett's writer's share of public performance royalties for the Post-2017 Compositions. However, SMC is, and has been, continuing to claim half of Ett's writer's share of public performance royalties on Post-2017 Compositions despite acknowledging that Ett's employment with SMC is over. To the extent SMC is no longer operating, SMG and/or Lyric continue to do so.

75. In particular, SMC (or SMG or Lyric) continues to receive 50% of Ett's writer's share of public performance royalties from BMI, refusing to inform BMI to change that participation even post-termination. Singer has asserted, without any legal or factual basis, that Defendants are entitled to receive this percentage in perpetuity.

76. Defendants are collecting money hand over fist beyond their contractual or other legal obligations given that Ett's Post-2017 Compositions total between 100,000 and 150,000 copyrighted works that are licensed non-exclusively for use in film and television shows.

Defendants' Improper Claim to Ett's Publishing Income and Copyright Ownership

77. Defendants are also improperly claiming 100% of other publishing royalties flowing from the Post-2017 Compositions. To the extent SMC is no longer operating, SMG and/or Lyric are improperly asserting these rights.

78. The APA is consistent with Ett's maintenance of, at very least, copyright co-ownership of all works other than his Historic Compositions. In paragraph 2.1(a)(i) of the APA, SMC obtained ownership of "Publishing Assets," which included "Compositions," but "Compositions" only refers to works created or co-created and owned/controlled by Ett as of

the Effective Time (i.e., January 1, 2017), not works created during the term of his employment (let alone after). In turn, as noted above, the ¶ 7(e) of the Employment Agreement excluded from SMC's ownership the results and proceeds of works Ett created as a songwriter or collaborator during the term of his employment. Accordingly, SMC does not have any copyright ownership in Ett's contributions to the Post-2017 Compositions.

79. With respect to the Post-2017 Compositions, Defendants would, at best, have co-owner status pursuant to the Copyright Act by virtue of hired co-writers. SMC regularly entered into composer work-for- hire agreements with songwriters who co-wrote compositions with Ett when Ett engaged in songwriting (the "Composer Agreements"). Per the Composer Agreements, each copyright in a musical composition composed by the composer-for-hire was a work made for hire for SMC, making SMC, as a matter of established copyright law, the initial author and owner of *that portion* of the work only. Ett co-wrote the Post-2017 Compositions and was, by default under the Copyright Act, a 50% co-author with the hired writers and by default was deemed a 50% author of the jointly created work. Ett was also explicitly listed as a co-writer in the Composer Agreements and listed as such in Defendants' BMI registrations (albeit inconsistently due to Defendants' mismanagement). Ett did not provide writing services as an employee for hire or sign away his share of the copyright in the Post-2017 Compositions via the Composer Agreements or otherwise (songwriting was not even a required job function pursuant to the Employment Agreement). Ett was not a signatory to the Composer Agreements, and of course his co-writers could not assign copyright rights to SMC that did not belong to them. Thus, established principles of co-authorship under copyright law made Ett a co-author of the Post-2017 Compositions with SMC and both copyright law and standard practices in the music publishing industry would only entitle SMC to retain half of the "publisher's share" of publishing royalties

transferred by third parties pursuant to the Composer Agreements.

80. But SMC has improperly claimed full copyright ownership in the Post-2017 Compositions and has unlawfully retained all of the "publisher's share" of royalties (alongside the aforementioned half of Ett's writer's share of performance royalties after his termination).

81. There is also a subset of Post-2017 Compositions that Ett wrote by himself during the term of his employment with Defendants (the "Independent Compositions"). As the initial (and, indeed, sole) author of the Independent Compositions, Ett is, as a matter of law, the author of those works under the Copyright Act. Because the applicable contracts clearly do not apply to these works other than, at most, SMC's contractual split of Ett's writer's share of public performance royalties during his employment, and the works were not co-authored or made as works for hire, none of the Defendants has any claim to copyright ownership therein as a matter of copyright law. And, as noted above, even if SMC had acted as the publisher of these songs, that would not entitle SMC to any copyright ownership rights or other publishing income absent a contract to the contrary.

82. Nonetheless, Defendants improperly and without legal or factual basis claim full copyright ownership and all publishing income in and to the Post-2017 Compositions and many Independent Compositions. To the extent SMC is no longer operating, SMG and/or Lyric are improperly asserting these rights.

83. As noted above, with respect to the Post-2017 Compositions, the number of copyrighted works at issue numbers in the six figures, and because Ett does not have access to Defendants' records anymore, he cannot list those compositions until discovery commences.

84. With respect to Independent Compositions, information also will largely be within the custody and control of Defendants, but Ett is aware of at least one song, written and

owned 100% by Ett, under the pseudonym Ryan Earl, which has been claimed to be owned and infringed by Defendants.

85. Specifically, the song "Just Take What You Need" ("Just Take") from the album "Back to the Hills of Caroline" by the Ryan Earl Band was written by Ett and Ett played guitar on the track. Ett owns two distinct copyrights in Just Take, namely (a) the composition copyright for music and lyrics, and (b) the sound recording copyright for the recorded version of his and his band's performance of Just Take (these two copyrights in the song are collectively referred to as the "Just Take Copyrights"), as he is the author of the music and lyrics and the assignee of any copyright rights other members of the band may have had in Just Take.

86. The Just Take Copyrights are registered with the United States Copyright Office pursuant to Reg. No. SR 985-086.

87. Defendants improperly licensed at least the Just Take Copyrights for use in the network television broadcast by NBC, "Grand Ole Opry: 95 Years of Country Music," which aired and was recorded on September 16, 2021. Defendants authorized the Just Take Copyrights for use in this program, including with respect to synchronization with visual content, and, upon information and belief, reproduced and/or distributed the Just Take Copyrights in connection with their unauthorized licensing to NBC thereof.

88. Upon information and belief, Defendants are similarly exploiting additional Independent Compositions. Ett cannot confirm which Independent Creations are being infringed due to the retention by Defendants of records such as "cue sheets" and licensing agreements which would provide the necessary identifying information. Once Ett becomes privy to Defendants' internal information regarding these works, he reserves the right to amend this Complaint to include infringement of the remaining Independent Works, as

appropriate.

89.  In turn, as noted above, Defendants also claim 100% of the publisher's share of income (public performance and otherwise) on Post-2017 Compositions, including many Independent Compositions, despite having done nothing to acquire Ett's publisher's share of income, including not being legal authors or owners under the Copyright Act and having never entered into a publishing deal with Ett.

90.  At most, SMC would be entitled to 50% of the publisher's share of income with respect to the Post-2017 Compositions as a co-owner of the copyrights. Under no circumstances is SMC (or any other Defendant) entitled to any publishing income flowing from the Independent Compositions other than potentially the contractually agreed-upon half of Ett's writer's share of public performance royalties during the term of his employment.

91.  Defendants are aware they do not fully own the copyrights in and to the Post-2017 Compositions or any copyrights in the Independent Compositions. In or around March 2021, Ett suggested that he start a separate publishing company in which to house all the Post-2017 Compositions to isolate those works in order to control the revenue streams given that Defendants were failing to engage in proper accounting for royalties going back as far as 2017 when Ett started as SMC's CEO.

92.  As a part of this discussion, Ett worked with SMC's controller Bernard Cruz and Borrino to determine what publishing moneys were owed to him beginning from January, 2017 to March 2021 for works Defendants admittedly had no right to monetize; Borrino estimated Ett could be owed be anywhere from $300,000 to $3,000,000 for that timeframe, so executives of Defendants clearly knew they did not own all of these copyrights or all of these income streams and also had a financial motivation for terminating Ett.

93. Based on Ett's investigation with Mr. Cruz, the amount owed turned out to be more than $729,000 in publishing royalties SMC was improperly keeping—and more than $1.1 million when including improperly retained post-employment composer's share royalties, as discussed above.

94. After seeing how much these musical assets were worth, Singer stated to Ett, in or around April 2021, that all Ett's compositions created after January 1, 2017—even the Independent Compositions and compositions written after his employment ended—were somehow works for hire for Defendants. This is factually and legally baseless, particularly given that works for hire have specific legal requirements set forth in the Copyright Act that are not met here (i.e., that the work was prepared by an employee in the scope of his employment, or was specially commissioned, in writing, for a work falling in a limited set of categories not relevant here), and as noted above, with respect to the Post-2017 Compositions, SMC is, at most, a co-author or co-owner of the copyrights.

95. Nonetheless, Defendants continue to claim ownership in intellectual property rights and collect and unjustly retain money from income streams to which they have no valid claim.

<u>**COUNT I**</u>
<u>**Declaratory Judgment – Copyright Ownership (28 U.S.C. § 2201(a))**</u>
<u>**(SMG, SMC, Lyric)**</u>

96. Ett realleges and incorporates by reference each and every allegation contained in each of the preceding paragraphs of the Complaint with the same force and effect as if fully set forth at length herein.

97. SMC had only a pro rata interest in the copyrights in and to the Post-2017 Compositions given that Ett was, as a matter of copyright law, a co-author of the Post-2017 Compositions (and is explicitly deemed a co-writer pursuant to the Composer Agreements),

and only the third-party composer's or composers' share of copyright ownership were assigned over to Defendants per the terms of the applicable contracts.

98. SMC has no copyright interest at all in the Independent Compositions, whether as co-author, co-owner, assignee, employer for hire, or otherwise.

99. The Independent Compositions were created solely by Ett and are not subject to any Composer Agreement. Ett is therefore the legal author and therefore sole owner of the Independent Compositions.

100. SMC has unlawfully laid claim to 100% copyright ownership (and 100% of the publishing income) for the Post-2017 Compositions and for many Independent Compositions, including without limitation, by way of Singer stating to Ett that such works were works made for hire—which they are not.

101. In light of SMC's opacity toward intellectual property ownership and corporate structures and transactions, and because Ett is aware that certain SMC copyrights have been transferred to other entities, Ett believes that some or all of the copyright interests in dispute may have been transferred to or shared with SMG and/or Lyric. Upon information and belief, Lyric now owns some or all of SMC's copyright rights in the Post-2017 Compositions, and SMG manages and administers them, with SMC maintaining some administrative function in collecting certain royalty streams.

102. Ett is the rightful co-copyright owner in and to the Post-2017 Compositions and the rightful 100% copyright owner in and to the Independent Compositions and should be declared as such.

103. As a result of Defendants' improper claim to full copyright ownership of the Post-2017 Compositions and many Independent Compositions, there is an actual, present, and justiciable controversy as to the parties' adverse legal rights, interests, and obligations

pertaining to the ownership of the copyrights in the Post-2017 Compositions and Independent Compositions and, consequently, entitlement to publishing income.

104. The controversy between Ett and Defendants is substantial and immediate and adversely impacts the parties' legal interests in a manner that is both real and immediate. A declaration of the parties' respective rights will serve a useful purpose in clarifying and settling these legal issues and a judgment would finalize the controversy and offer relief from uncertainty.

**COUNT II**
**Copyright Infringement**
**(SMG)**

105. Ett realleges and incorporates by reference each and every allegation contained in each of the preceding paragraphs of the Complaint with the same force and effect as if fully set forth at length herein.

106. The Independent Compositions—including the Just Take Copyrights—are musical compositions comprised of notes and lyrics and are original, fixed, copyrightable works within the subject matter of copyright pursuant to 17 U.S.C. § 102(2). As noted above, Ett solely owns the Independent Compositions and therefore has authority to enforce his copyright rights therein. Ett is the original author of the Independent Compositions, including without limitation the Just Take Copyrights, and independently created them and did not copy them from any other source or work.

107. The Just Take Copyrights encompass a composition and sound recording as referenced above. The Just Take Copyrights are original, fixed, copyrightable works within the subject matter of copyright pursuant to 17 U.S.C. §§ 102(2) & (7). As noted above, Ett owns both the composition (via his sole authorship) and sound recording (based on assignments of rights from all other band members) of the Just Take Copyrights and thereby

has authority to enforce his copyright rights therein.

108.     As noted above, Defendants have no claim to ownership in any share of the copyrights in the Independent Compositions or sound recordings thereof, including without limitation the Just Take Copyrights.

109.     Upon information and belief, SMG has taken over managing, administering, and monetizing many Independent Compositions, including without limitation the Just Take Copyrights, by way of licensing such compositions (and associated sound recordings) to third parties without Ett's consent.

110.     Licensing the Independent Compositions (and associated sound recordings) includes reproducing and/or distributing such compositions and sound recordings to third parties.

111.     SMG has improperly exploited these works without authorization and has collected unauthorized royalties therefrom.

112.     SMG has infringed Ett's exclusive rights under 17 U.S.C. § 106(1) to reproduce certain Independent Compositions (and associated sound recordings), including the Just Take Copyrights.

113.      SMG has infringed Ett's exclusive rights under 17 U.S.C. § 106(3) to distribute copies of certain Independent Compositions (and associated sound recordings), including the Just Take Copyrights.

114.     SMG owes Ett all moneys earned from its unlawful exploitation of Independent Compositions (and associated sound recordings), including without limitation, the Just Take Copyrights, and is therefore liable to Ett for damages in an amount to be determined at trial, as well as injunctive relief, attorney's fees and costs, and interest.

## COUNT III
### Vicarious and Contributory Copyright Infringement
### (Lyric, SMC, and SMG)

115. Ett realleges and incorporates by reference each and every allegation contained in each of the preceding paragraphs of the Complaint with the same force and effect as if fully set forth at length herein.

116. Lyric is vicariously liable under the Copyright Act for SMG's direct infringement.

117. Lyric is the parent company of SMG. Upon information and belief, Lyric has the right and ability to supervise and control the infringing conduct of its subsidiaries (which, as noted above, are all under the common control of Singer and Cameron); and because Lyric has an obvious and direct financial interest in the aforementioned copyright infringements in that it profits when its subsidiaries and executives profit from ill-gotten income flowing from the Independent Compositions (and associated sound recordings) including, without limitation, the Just Take Copyrights.

118. Lyric is also contributorily liable under the Copyright Act for SMG's direct infringement.

119. Lyric is the parent company of SMG. As the parent company under the common control of Singer and Cameron, upon information and belief, Lyric had direct knowledge of the direct infringements of SMG, and upon information and belief, materially contributed to the infringement by the provision of human resources (including Singer, Cameron, and Borrino) and financial resources and company infrastructure for exploiting the Independent Compositions (and associated sound recordings), including, without limitation, the Just Take Copyrights.

120. These contributions are particularly important given that, as noted above, SMC and/or SMG likely transferred their copyright and royalty interests in some or all of Ett's compositions to Lyric, and Lyric—a sophisticated private equity firm dealing specifically with music assets and controlled by Singer and Cameron—was fully aware of what it does and does not own and control, which definitively does not include the Independent Compositions or any associated sound recordings.

121. Upon information and belief, Lyric is vicariously and contributorily liable for direct infringements of other Independent Compositions aside from the Just Take Copyrights, and the above analyses will apply equally to other direct infringements uncovered during discovery.

122. SMC is also contributorily liable under the Copyright Act for SMG's direct infringements.

123. While SMC seems to no longer be a fully functioning or operating company, upon information and belief, SMC (and/or its parent companies SMG and/or Lyric) continues to collect residual income derived from the previous exploitation of musical works by SMC (including the Independent Compositions) and the current exploitation by third parties.

124. SMC is also under the common control of Singer and Cameron had direct knowledge of the direct infringements of SMG, and upon information and belief, materially contributed to the infringements by the provision of administrative and accounting resources and infrastructure.

125. Upon information and belief, SMC is contributorily liable for direct infringements of other Independent Compositions aside from the Just Take Copyrights, and the above analyses will apply equally to other direct infringements uncovered during discovery.

126.     Finally, SMG is contributorily liable for third parties' uses of the Just Take Copyrights. As noted above, at the very least, SMG licensed, without authority, the Just Take Copyrights for use in a television broadcast. The end-use inherently involved unauthorized synchronizing of the composition and sound recording to visual content, which infringes the derivative works right under 17 U.S.C. § 106(2).

127.     SMG had knowledge of these direct infringements it was authorizing given it provided the Just Take Copyrights to NBC even though it knew it had no rights in the Just Take Copyrights, and materially contributed to the direct infringement by the provision of the Just Take Copyrights (and accompanying documentation) to NBC to synchronize and publicly perform without authorization.

128.     Permitting and authorizing third parties to create derivative works such as audiovisual works synchronized with the Independent Compositions and associated sound recordings is an exclusive right that solely belongs to Ett.

129.    The end-user of the Just Take Copyrights in the above-mentioned television broadcast is the direct infringer by way of, *inter alia*, creating an unauthorized derivative audiovisual work and publicly performing that work (on the composition side), in violation of Ett's exclusive rights under 17 U.S.C. § 106(2) and 106(4).

130.    Upon information and belief, SMG is contributorily liable for direct infringements of other Independent Compositions aside from the Just Take Copyrights, and the above analyses will apply equally to other direct infringements uncovered during discovery.

131.    Lyric, SMC, and SMG are liable to Ett for damages in an amount to be determined at trial, as well as injunctive relief, attorney's fees, costs, and interest.

## COUNT IV
## Breach of Contract
## (SMC, SCH, SMC LuxCo)

132.    Ett realleges and incorporates by reference each and every allegation contained in each of the preceding paragraphs of the Complaint with the same force and effect as if fully set forth at length herein.

133.    SMC, SHC, and Spirit LuxCo (collectively, the "Contract Defendants") entered into the APA with Ett, which forms a valid and binding contract.

134.  Paragraph 2.1(a)(iii) of the APA entitles the Contract Defendants to 50% participation in his writer's share of public performance income in Post-2017 Compositions during the term of Ett's employment.

135.  Pursuant to these provisions, Ett signed a notice to public performance organizations such as BMI instructing them to pay one-half of his writer's share of public performance royalties to the Contract Defendants. This assignment was intended to last only during Ett's employment with SMC.

136.  The APA does not entitle the Contract Defendants to a continuing, post-employment share in Ett's writer's share of public performance royalties for the Post-2017 Compositions. However, the Contract Defendants are, and have been, continuing to claim half of Ett's writer's share of public performance royalties on Post-2017 Compositions despite acknowledging that Ett's employment with SMC is over.

137.  The Contract Defendants continue to receive 50% of Ett's writer's share of public performance income from BMI in the Post-2017 Compositions, refusing to inform BMI to change that participation even post-termination. The Contract Defendants, via Singer, assert without any legal or factual basis that they are entitled to receive this percentage in perpetuity.

138. The Contract Defendants have also wrongfully claimed and retained 100% of the publisher's share of publishing income on Post-2017 Compositions (public performance and otherwise) despite having no contractual or other legal basis to make such a claim or retain such income.

139. The Contract Defendants have similarly improperly claimed and retained 100% of publishing income (public performance and otherwise) derived from Independent Compositions despite the fact that the APA is clear that such works are not included within the scope of what the Contract Defendants own or share (other than, at most, a contractual participation in half of Ett's writer's share of public performance income limited to the term of Ett's employment by SMC).

140. The Contract Defendants also breached their contractual obligation to administer Ett's compositions.

141. Paragraph 2.2(a) of the APA obligated Defendants to "assume and . . . pay and perform, satisfy and otherwise discharge all obligations and liabilities" accruing with respect to "Assets," including, *inter alia*, the "Ett Future Writer Share" and therefore handle administrative tasks relating to royalty payments for such "Assets," which would include the "Ett Future Writer Share."

142. Paragraph 6.6(a) of the APA obligated the Contract Defendants to "be responsible for the payment of all royalties and other sums actually payable to Writers, third-party income participants and holders of Outside Interests which result from all" fees and payments earned as a result of the exploitation or use of any "Assets," which include the Post-2017 Compositions, and ¶ 6.6(b) obligated the Contract Defendants to receive all payments from performing rights societies and other payors.

143. While the Contract Defendants unlawfully retain some income from the Post-

2017 Compositions, they have, by and large, failed and continue to fail to effectively administer and exploit the Post-2017 Compositions consistent with basic industry standards and their contractual responsibility to "discharge all obligations" related to the acquired assets.

144.    Specifically, the Contract Defendants failed to register thousands of Ett's Post-2017 Compositions with the applicable U.S. performing rights organization, BMI, as well as international performing rights organizations around the world. This failure to register resulted in failure to collect significant sums of money from domestic and global public performance royalties.

145.    The Contract Defendants also failed to consistently or continually maintain and update SMC's own database and search engine of its musical works, resulting in the failure to add thousands of the Post-2017 Compositions, as well as their relevant metadata. Having an incomplete database meant that potential clients were (and continue to be) unable to access, assess, and license those missing works. This administrative failure means that potential clients in over 90 territories all over the world have had no visibility into the availability of a great many of the Post-2017 Compositions, resulting in the loss of countless dollars of licensing revenue.

146.    Further, Ett recently discovered that SMC removed upwards of 30,000 of Ett's works from its catalogue, which Ett believes includes at least some Post-2017 Compositions. This is another complete failure to exploit, monetize, and otherwise administer these works consistent with the Contract Defendants' responsibility to "discharge all obligations" as music publishers related to the acquired assets.

147.    As noted above, SMC—at the behest of Singer, Cameron, and Borrino—refused to allow Ett to hire the administrative personnel needed to successfully carry out the above-mentioned functions that were necessary to monetize the Post-2017 Compositions despite

Ett's contractual ability to do so pursuant to the Employment Agreement.

148. The Contract Defendants also failed to register many works with the U.S. Copyright Office, depriving Ett of substantive legal/enforcement rights.

149. SHC and SMC LuxCo are defined, together with SMC, as "purchaser" under the APA, and § 12.1 of the APA specifically states that SHC and SMC LuxCo are jointly and severally liable for obligations under Article 2 of the APA.

150. Thus, any breaches of the APA by SMC are imputed to both SCH and Spirit LuxCo by way of § 12.1.

151. Ett fully performed all his duties and fulfilled his obligations under the APA.

152. Ett is not in breach of any provision of the APA.

153. Because of the Contract Defendants' willful breach of the APA, the Contract Defendants have caused Ett actual damages in an amount to be determined at trial which include, without limitation, improperly retained royalties and publishing revenues and lost income and forfeited legal rights on Post-2017 Compositions that Defendants failed to administer.

### COUNT V
### Breach of Covenant of Good Faith and Fair Dealing
### (SMC, SCH, SMC LuxCo)

154. Ett realleges and incorporates by reference each and every allegation contained in each of the preceding paragraphs of the Complaint with the same force and effect as if fully set forth at length herein.

155. There is a covenant of good faith and fair dealing implied in every contract, including the APA.

156. Per the APA, the Contract Defendants "are in the business of acquiring, publishing, administering *and exploiting* musical compositions and master recordings related

33

thereto (the <u>Business</u>").” (Emphasis added).

157.    The purpose of the APA was for the Contract Defendants to acquire certain of Ett's assets “in connection with the Business,” which includes exploitation and monetization of those assets.

158.    The APA includes complex provisions for revenue sharing, royalty splits, earn-outs, cash flow participation, and, as noted above, administration of intellectual property.

159.    In the alternative to the contractual violations stated above regarding failed administration and exploitation of the compositions—including failure to properly include many of the Post-2017 Compositions in company databases and search engines, failure to retain appropriate staff to handle basic administrative tasks ubiquitous and necessary in the music industry, and removal of approximately 30,000 compositions from the SMC catalogue—such failures violate the covenant of good faith and fair dealing in the event the Court determines they are not explicitly covered by the APA (which Ett maintains they are).

160.    These failures undermine the very purpose of the APA, which was to acquire musical assets from Ett and his companies and exploit them in order to maximize earnings for both Ett and the Contract Defendants and destroys Ett's ability to receive the benefit of the express promise in the APA.

161.    The Contract Defendants' willful breaches of the implied covenant of good faith and fair dealing have caused Ett damages in an amount to be determined at trial.

**COUNT VI**
**Fraudulent Inducement (Singer)**

162.    Ett realleges and incorporates by reference each and every allegation contained in each of the preceding paragraphs of the Complaint with the same force and effect as if fully set forth at length herein.

163. In a meeting in Los Angeles on April 9, 2019, and in discussions and emails thereafter, Singer represented to Ett that Ett would have a "greater role" in the operations and future of the companies (including a position and title with SMG and/or Lyric) and that Ett would receive from the companies the benefits of an "exciting incentive plan" and a series of "lucrative benefits" if he signed the Amendment to extend his employment as SMC's CEO.

164. These representations were false, and Singer intended to and succeeded in inducing Ett to sign the Amendment and agree to continued employment with SMC under the terms of the Amendment by way of these false representations.

165. Singer knew these statements were false when he made them. As evidenced by the nearly two intervening years between enactment of the Amendment and Ett's termination shortly before the Northleaf investment, Singer never intended to implement that promised benefit as applied to Ett.

166. Rather, he intended to and succeeded in inducing Ett to agree to continued employment under the terms of the Amendment by falsely promising to provide Ett with lucrative benefits, which Ett reasonably understood to include Incentive Allocations, or other standard forms of executive compensation in private equity-backed transactions in the music publishing industry.

167. Absent such false statements, on information and belief, Singer knew Ett would not sign the Amendment, particularly in light of Ett's expression to executives that his compensation via salary or normal-course bonuses would be a small part of a much larger compensation package; because, under the Employment Agreement and APA SMC was earning more from its share in performance royalties than Ett was making as CEO; and because Ett agreed to an obviously below-market salary anticipating significant backend compensation.

168. Singer knew full well that Ett expected far more in compensation given the value of SMC's participation in Ett's composer royalties—value that increased with every passing day that SMC refused to offer Ett any additional financial incentives as had been promised. Indeed, Singer confirmed this knowledge; when he was confronted by Ett regarding the failure to provide the Plan or Incentive Allocations, Singer told Ett that "lots of people make bad deals."

169. Singer also knew that he needed to use the revenue streams generated from Ett's musical works (and Ett's continuing presence as a competent and knowledgeable CEO of an important subsidiary company of SMG) in order for SMG to secure a new round of investment, and that if Ett was aware that Singer intended to cut him out of any Incentive Allocations generated from that new round of investment, Ett would not continue to work for SMC, undermining the value of SMC's portfolio of Ett's works and destabilizing SMC. On information and belief, SMG's negotiations for a new round of funding had been going on for at least many months, if not longer, and coincided with some or all of Singer's false promises to lull Ett into a false sense of receiving a significant financial benefit in continuing his employment with SMC.

170. Ett justifiably and reasonably relied on Singer's false promises. Ett believed that Singer, the CEO of SMG, was a reputable and trustworthy representative of the companies which he was leading, and such statements led Ett to believe that Singer wished for both his companies and Ett to experience continued financial success.

171. Ett relied on these false promises to his detriment and was damaged because he was deprived of the value of the Plan and the expected Incentive Allocations, and he lost opportunities to accept profitable work, particularly given that the Employment Agreement (¶ 2(b)) restricted Ett from taking on additional material employment in the music

publishing space that would have been lucrative.

172. In light of Ett's influence and relationships in the music industry and his ability to start a competitive music publishing or administration company, there were several possible alternative lucrative business opportunities he could have pursued had he opted to leave SMC.

173. For instance, in 2020, Ett was approached by various music industry power players to create an independent media company that would, among other things, monetize music catalogues. These third parties had assembled a formidable team to launch an ambitious media enterprise. Ett ultimately did not pursue this opportunity in material part because he had agreed to the Amendment in reliance on Singer's fraudulent statements as set forth above.

174. Singer is liable to Ett for damages for perpetuating this fraud, in an amount to be determined at trial, including without limitation, the value of Ett's lost business opportunities and the difference in value between the expected financial incentives (such as the Plan and Incentive Allocations) that Ett expected (or what other executives received in terms of comparable financial benefits) and his actual compensation.

175. Singer acted willfully and should also be subject to punitive or exemplary damages in an amount to be determined at trial.

### COUNT VII
### Aiding and Abetting Fraud
### (Cameron)

176. Ett realleges and incorporates by reference each and every allegation contained in each of the preceding paragraphs of the Complaint with the same force and effect as if fully set forth at length herein.

177. Cameron was intimately involved in the corporate transactions referenced herein. He was the architect behind the Northleaf investment and, upon information and belief, was

37

personally aware of Singer's discussions with Ett concerning Ett's greater involvement in the SMG group of companies and the promised Plan and Incentive Allocations. Cameron was on the executive committee that Ett drove SMC to form and had personal knowledge of the intricate goings-on within SMC, particularly related to investments, funding, staffing, and capital raising.

178. Upon information and belief, in light of his significant and important role within the companies and his close working relationship with Singer, Cameron had actual knowledge of the conversations between Singer and Ett which form the basis of Ett's fraudulent inducement claim against Singer.

179. Upon information and belief, Cameron was fully aware of the fraudulent statements Singer was making and provided substantial assistance and encouragement to Singer given Cameron's aligned financial incentives and his deep involvement with the transactions and investments at issue.

180. Cameron is liable for aiding and abetting Singer in his fraudulent inducement of Ett as described above.

181. Cameron is liable to Ett for damages for perpetuating Singer's fraud, in an amount to be determined at trial, including without limitation, the value of Ett's lost business opportunities and the difference in value of the financial incentives (such as Incentive Allocations) that were promised and that Ett expected (or what other executives received in terms of comparable financial benefits) and his actual compensation.

182. Cameron acted willfully and should also be subject to punitive or exemplary damages in an amount to be determined at trial.

## COUNT VIII
## Unjust Enrichment
## (SMG and Lyric)

183. Ett realleges and incorporates by reference each and every allegation contained in each of the preceding paragraphs of the Complaint with the same force and effect as if fully set forth at length herein.

184. As detailed above, Defendants have been (and still are) wrongfully and unjustly retaining 50% of Ett's writer's share of post-termination public performance royalties on Post-2017 Compositions and 100% of other publisher's share of income on Post-2017 Compositions and the Independent Compositions.

185. While SMC (and the other Contract Defendants) are in breach of contract, non-signatories SMG and Lyric have been unjustly enriched as a result of the Defendants' collective misappropriation of funds.

186. SMG actively monetizes and is enriched by its wrongful activities concerning the Post-2017 Compositions and Independent Compositions as detailed above.

187. Lyric, as the parent company of SMG and indirect parent of SMC, is also enriched by its subsidiaries' wrongful monetization of the Post-2017 Compositions and Independent Compositions.

188. Defendants are unfairly benefiting from their unjust retention of large sums of money owed to Ett, and from which Ett cannot derive any benefits.

189. SMC, SMG, and Lyric are all under the common control of Singer and Cameron, and thus all knew that they were not entitled to the above-mentioned sums of money.

190. On information and belief, SMG and Lyric also used these ill-gotten gains to increase the value of Defendants' catalogues at Ett's expense and to their own benefit by leveraging their raise of $500,000,000 in capital from Northleaf. They were able to

misrepresent to investors, in connection with their valuation of the companies, that they retained various royalty streams when they, in fact, did not have any valid claim to those funds.

191.  Because the above-mentioned income streams would be valued at a multiple in a transaction such as the recapitalization through Northleaf, SMG and Lyric were unjustly enriched by using improperly retained income streams to secure a $500,000,000 investment.

192.  It is against equity and good conscience to permit SMG and Lyric to retain the above-referenced remuneration and other monetary value that has been improperly withheld from Ett.

193.  SMG and Lyric are liable to Ett for an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** for all the foregoing reasons, Ett respectfully requests that the Court rule as follows:

A.  Declare that Ett jointly owns the copyrights in and to the Post-2017 Compositions such that Defendants would only own, at most, a 50% copyright interest (and 50% of publisher's share of publishing royalties), and that Ett owns 100% of the copyrights in and to the Independent Compositions and that Defendants hold no copyright interest, authorship, or ownership therein, and no entitlement to publishing income;

B.  Hold that SMG engaged in copyright infringement of the Independent Compositions, including the Just Take Copyrights as detailed above;

C.  Hold that Lyric, SMG, and SMC contributorily and/or vicariously infringed the copyrights in the Independent Compositions, including the Just Take Copyrights as detailed above;

D.  Hold that SMC, SCH, and Spirit LuxCo breached the APA as detailed above;

E.  Hold that SMC, SCH, and Spirit LuxCo breached the implied covenant of good faith and fair dealing as detailed above;

F.  Hold that Singer engaged in fraudulent inducement;

G.  Hold that Cameron aided and abetted Singer's fraudulent inducement;

H.  Hold that SMG and Lyric have been unjustly enriched in connection with their wrongful retention of royalties rightfully owed to Ett, as well as their wrongful retention of financial benefits associated with their recapitalization;

I.  Hold that Defendants are liable to Ett for monetary damages resulting from Defendants' unlawful actions, plus interest, in an amount to be determined at trial in this matter, including:

   a.  actual or statutory damages (at Ett's election) for direct and indirect copyright infringement, as well as costs and attorney's fees, and finding that Defendants' infringements were willful, entitling Ett to up to $150,000 in statutory damages (if he so elects) per work infringed;
   b.  compensatory damages for breach of contract and/or breach of covenant of good faith and fair dealing;
   c.  compensatory and punitive damages for fraudulent inducement and aiding and abetting fraudulent inducement;
   d.  damages for unjust enrichment, including disgorgement of Defendants' ill-gotten gains; and
   e.  prejudgment interest.

J.  that a permanent injunction is appropriate, ordering Defendants to:

   1.  Immediately cease and desist from any further claim to any portion of Ett's writer's share of public performance royalties derived from Post-2017 Compositions or Independent Compositions after the date of Ett's termination from SMC;

   2.  Immediately cease and desist collecting any such improper public performance royalties referenced above pertaining to the Post-2017 Compositions and Independent Compositions and account to and reimburse Ett for any wrongfully retained moneys in connection therewith;

   3.  Immediately notify BMI and any other performing rights organization from which Defendants collect public performance royalties that Defendants do not maintain any ownership, interest, or share in Ett's writer's share of public performance royalties on the Post-2017 Compositions or Independent Compositions after the date of Ett's termination or any of Ett's publisher's share of public performance royalties, that BMI's registrations thereof should be amended as appropriate, and that all money currently owed or owed in the future should be paid directly to Ett;

   4.  Immediately arrange for the proper registration of the unregistered Post-2017 Compositions and Independent Compositions (a) with BMI and other appropriate performing rights organizations around the world and (b) with the Copyright Office properly affording co-authorship and ownership to Ett as a co-writer of the Post-2017 Compositions and sole authorship and ownership to Ett of the Independent Compositions, at Defendants' sole expense, and (c) to arrange for the proper administration of the same;

5. Immediately reinstate the improperly removed compositions (approximately 30,000) to the SMC catalogue and add any missing Post-2017 Compositions to SMC's database and search engine;

6. Immediately cease and desist from any continued claim to ownership in and to 100% of the copyrights and publishing income for Post-2017 Compositions;

7. Immediately cease and desist collecting any such improper publishing income referenced above pertaining to the Post-2017 Compositions and account to and reimburse Ett for any wrongfully retained moneys in connection therewith;

8. Immediately cease and desist from any continued claim to copyright ownership in and to any share of the copyrights and any publishing income for Independent Compositions (including, without limitation, the Just Take Copyrights); and

9. Immediately cease and desist collecting any such improper publishing income referenced above pertaining to the Independent Compositions and account to and reimburse Ett for any wrongfully retained moneys in connection therewith.

K. Award Ett his costs and reasonable attorney's fees as applicable.

L. Award such other relief as this Court may deem just and proper.

## **JURY DEMAND**

Ett demands a trial by jury as to all issues so triable.


Dated: New York, New York
April 26, 2024


COWAN, DEBAETS, ABRAHAMS & SHEPPARD LLP

/s/Scott J. Sholder
Scott J. Sholder
Benjamin S. Halperin
60 Broad St., 30th Floor
New York, New York 10004
Telephone: (212) 974-7474
Facsimile: (212) 974-8474
Email: SSholder@cdas.com; BHalperin@cdas.com

*Attorneys for Alan Ett*